DeCorte *v.* NEW YORK CENTRAL RAILROAD COMPANY.

DECISION OF THE COURT.

1. RAILROADS—TRUCKS—EQUALLY DIVIDED COURT.
   Judgment for plaintiff passenger in defendant railroad company's single-car train when hit by defendant association's milk truck is ordered reversed and new trial granted as to defendant association, the Supreme Court being equally divided as to whether new trial should be accorded defendant railroad company or judgment entered for it.

SEPARATE OPINION FOR REVERSAL.

DETHMERS, KELLY, and O'HARA, JJ.

2. RAILROADS—TRUCKS—ASSUMPTION BY ENGINEER—EVIDENCE.
   *Evidence presented in northwestbound single-car train passenger's action against railroad company, owner of eastbound truck, and*

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  5 Am Jur 2d, Appeal and Error § 902.
[2]  44 Am Jur, Railroads § 507.
[3, 28]  44 Am Jur, Railroads § 511.
[4]  44 Am Jur, Railroads § 568.
[5]  44 Am Jur, Railroads § 502.
[6, 11]  3 Am Jur 2d, Agency § 2.
[7, 15]  3 Am Jur 2d, Agency §§ 261, 267.
[8]  14 Am Jur 2d, Carriers § 1198.
    22 Am Jur 2d, Damages § 195.
[9, 17, 20, 22, 23, 25, 26, 32]  53 Am Jur, Trial §§ 860, 905.
[10]  22 Am Jur 2d, Damages § 363 *et seq.*
[12]  5 Am Jur 2d, Appeal and Error § 624.
    Counsel's appeal in civil case to wealth or poverty of litigants as ground for mistrial, new trial, or reversal.  32 ALR2d 9.
[13]  20 Am Jur 2d, Costs § 90.
[14, 28]  44 Am Jur, Railroads § 506 *et seq.*
[16]  20 Am Jur 2d, Courts §§ 111, 112.
[18]  31 Am Jur, Jury §§ 10, 66.
[19]  16 Am Jur 2d, Constitutional Law § 579.
[21]  16 Am Jur 2d, Constitutional Law § 545 *et seq.*
[24]  53 Am Jur, Trial § 912.
[27]  5 Am Jur 2d, Appeal and Error § 1011.
[29]  44 Am Jur, Railroads § 513.
[30]  44 Am Jur, Railroads § 486 *et seq.*
[31]  44 Am Jur, Railroads § 420.
[33]  5 Am Jur 2d, Appeal and Error §§ 1011, 1012.

cooperative association for which truck was operated at time it collided with midsection of car in which plaintiff was riding held, to disclose nothing upon which to base conclusion that at any time before it was too late the engineer, proceeding at 65 miles per hour, should have been alerted and have realized that he could no longer rely on the assumption that the truck, going at 40 to 45 miles per hour, would stop before crossing, the intervening quadrant of the intersection containing obstruction to view.

3. SAME—TRAFFIC AT CROSSING.
   Railroad train need not decrease its speed or stop for passage of crossing traffic until it becomes apparent to the operators of the train that the traffic approaching or upon the right-of-way is not stopping or getting out of the way as it may be assumed that the principles of common sense and the motive of self-preservation common to mankind will obtain.

4. SAME—CROSSING—TRUCKS.
   A railroad train has the right-of-way at a traffic crossing and its engineer may assume that a truck approaching the crossing would stop until it becomes apparent that the truck could not or would not stop.

5. SAME—NEGLIGENCE—EVIDENCE—CROSSING ACCIDENT.
   Railroad company's motion for judgment non obstante veredicto should have been granted in passenger's action against it for injuries received when truck collided with midsection of car in which plaintiff was riding, where there is no evidence to go to the jury on the question of the railroad's negligence.

6. PRINCIPAL AND AGENT—CONTROL.
   Control is an important indicia of the existence of an agency or employment relationship.

7. SAME—TRUCKER—MARKETING AND BARGAINING COOPERATIVE—EVIDENCE.
   Evidence that farmer-owned and farmer-controlled marketing and bargaining cooperative required its truckers engaged in transporting milk solely for certain of its designated members to designated stations to use certain forms, keep certain records, treat milk in a certain manner, take milk samples, follow bulletins and fieldmen's instructions, take specified care of the truck, sell association products, receive pay from the association, and employ only 1 route, and permit association to take away route without compensation presented a question of fact for the jury as to whether relation between the trucker and the association was such as to make latter responsible for tort of trucker.

8. DAMAGES—PHYSICAL INJURY ACCOMPANIED BY EMOTIONAL DIS-
TURBANCE, FRIGHT, AND MENTAL ANGUISH.

> *Emotional disturbance, fright, and mental anguish which accompanied forceful personal injury when truck derailed single-car railroad train in which plaintiff was a passenger formed a proper basis for award of damages and evidence thereof was properly received, the fact that plaintiff listened to cries and saw other passengers bleeding and attempted to help them not diminishing her right to recover for mental anguish.*

9. TRIAL—MISTRIAL—CONVERSATION WITH JUROR—PREJUDICE.

> *Mistrial was properly denied in case arising out of railroad crossing accident, where it does not appear that conversation between juror while deciding case and a court officer from one of the other courts in the circuit who had transported plaintiff from her home to the courthouse and back, or conversation between plaintiff and member of jury panel but not one of the jurors trying the case, concerned anything prejudicial to the case.*

10. DAMAGES—EXCESSIVE VERDICT—APPEAL TO PASSION, PREJUDICE,
OR SYMPATHY.

> *Verdict of $31,518 for plaintiff in action arising out of railroad crossing accident held, not excessive in view of extent of plaintiff's personal injuries accompanied by emotional disturbance, fright, and mental anguish, and record is convincing that no improper conduct or emotional appeal relating to damages occurred, and jury does not appear to have been swayed by passion, prejudice, sympathy, or any other improper motive.*

11. PRINCIPAL AND AGENT—EVIDENCE OF CONTROL.

> *Evidence that subsequent to accident appellant marketing and bargaining association fired owner of truck which had derailed railroad's single-car train in which plaintiff had been a passenger was properly received as bearing on plaintiff's claim that it was material to the question of the relationship between the association and the truck owner and indicative of the association's control over the truck owner in his operations of the truck.*

12. APPEAL AND ERROR—PREJUDICE—SIZE AND WEALTH OF DEFENDANT
ASSOCIATION.

> *Offers of evidentiary materials and comments by plaintiff's counsel ostensibly offered and made to show nature of relationship between defendant marketing and bargaining association and defendant owner of truck which had collided with and derailed single-car railroad train in which plaintiff was a pas-*

senger, and to inject into the minds of the jurors the corporate bigness and wealth of appellant association held, not reversible error, in view of what defense counsel himself had said to jurors in such connection.

13. Costs—Delay in Taxing—Waiver.

The failure of plaintiff to tax costs until after the lapse of 20 days after entry of judgment waived her right to costs in view of provision of court rule limiting the time within which bill of costs may be taxed (GCR 1963, 526.10[2]).

### Separate Opinion for Reversal.
### Black, J.

14. Railroads—Trucks—Negligence of Engineer—Evidence.

Evidence presented in northwestbound single-car train passenger's action against railroad company, owner of eastbound truck, and cooperative association for which truck was operated at time it collided with midsection of car in which plaintiff was riding held, to disclose nothing upon which to base conclusion that defendant railroad company's engineer, now dead, was negligent.

15. Principal and Agent—Trucker—Marketing and Bargaining Cooperative—Evidence.

Evidence presented in action by passenger on defendant railroad company's single-car train against company and defendant milk marketing and collective bargaining cooperative association held, sufficient to permit jury to find association was responsible for negligence of truck driver whose truck collided with midsection of car in which plaintiff was riding.

16. Courts—Supreme Court—Superintending Control.

The purpose of the constitutional mandate according the Supreme Court general superintending control over all courts is to keep the courts themselves within bounds and to insure the harmonious working of our judicial system (Const 1908, art 7, § 4; Const 1963, art 6, § 4).

17. Same—Bailiffs—Sheriffs—Jury.

Bailiffs, sheriffs, and other court personnel should be warned about practices involving associations with jurors both in and out of the courtroom which might create the opportunity to influence the jury's decisions.

18. Jury—Tampering—Due Process.

Due process of law, insofar as a trial by jury is involved, requires that court personnel shall not be·guilty of any mis-

conduct that could influence the jury or afford ground for suspicion that the jury was or might be tampered with or was deliberating in the presence of a court officer.

19. SAME—DUE PROCESS—EVIDENCE.

Due process of law in connection with a trial by jury requires the jury's verdict to be based upon evidence developed at the trial.

20. COURTS—OFFICERS—FRATERNIZATION WITH JURORS.

It is incumbent upon a trial judge to restrain his court officer from untoward fraternization with jurors.

21. CONSTITUTIONAL LAW—DUE PROCESS—LIFE—LIBERTY—PROPERTY.

Due process of law is owing to persons whose life or liberty is in jeopardy and, as well, to persons whose property is threatened.

22. TRIAL—MISTRIAL—MISCONDUCT OF COURT PERSONNEL.

Denial of defendants' motions for mistrial, midway through 17-day trial of action for personal injuries, based on defense counsel's discovery that plaintiff and some of her witnesses were associating with court officer for another judge of the same circuit and that such officer was in turn associating with all jurors in the common jury room, and no aggressive measure to separate such officer from the trial jury was thereafter taken, held, reversible error.

23. SAME—MISCONDUCT OF COURT PERSONNEL—INSTRUCTIONS.

Instruction by trial court to court officer for another judge in the same circuit that he was not to go into jury rooms except upon official business of the court held, wholly insufficient, where he had been associating with plaintiff and her witnesses in case before the court, and neither the trial court's own officer nor the other officer were thereafter instructed about associating with the jury, nor instruction given that jurors should report infractions or attempted infractions to the court.

24. JURY—EVIDENCE.

Jurors are sworn to receive all their knowledge about a case on the record in open court.

25. SAME—DUE PROCESS—MISCONDUCT OF COURT PERSONNEL.

There was a denial of due process of law to defendants where plaintiff and some of her witnesses were associating with a court officer for another judge in the same circuit, which officer was associating with all of the jurors including those involved in trial of case in which plaintiff was a party.

26. TRIAL—MISTRIAL—MISCONDUCT OF COURT PERSONNEL.
    *Failure to grant mistrial when it was brought to the attention of the trial judge that the court officer for another judge in the same circuit was associating with plaintiff and her witnesses and then mingling with the jurors in the common jury room during course of 17-day trial held, reversible error.*

27. COSTS—NEW TRIAL AS TO 1 OF 2 DEFENDANTS.
    *Costs of appeal are ordered to abide the final result, where judgment in action against 2 defendants is ordered reversed and a new trial granted as to 1 defendant.*

SEPARATE OPINION FOR REVERSAL.

T. M. KAVANAGH, C. J., and SOURIS, SMITH, and ADAMS, JJ.

28. RAILROADS—NEGLIGENCE—SPEED—OBSTRUCTIONS—EVIDENCE.
    *Evidence adduced in action by passenger of single-car train for injuries she sustained when such car was struck by milk truck at grade crossing held, sufficient to present for jury the question of negligence of defendant railroad company's engineer, where it appears he gave 3 short blasts at blow post, 1,398 feet from the intersection, train could be stopped in 1,230 feet, a prolonged or distress blast was made beginning at about 1,000 feet, 65-mile-per-hour speed was maintained until impact with truck being driven at 45 miles per hour, and there was conflicting testimony as to obstructions to view between the engineer and truck.*

29. SAME—AVOIDANCE OF INJURY TO PERSON ON OR ABOUT TO GET ON TRACKS—WARNING.
    *A railroad engineer has a duty to warn a person on its tracks or about to get on its track unaware of the danger involved, or apply brakes, or use such other precautions as may be reasonably necessary to avoid injury.*

30. SAME—NEGLIGENCE OF TRAIN OPERATOR.
    *It is negligence for a train operator to take no evasive action when it is apparent to him that a person or his vehicle is in danger and unaware of his peril.*

31. SAME—PASSENGERS—NEGLIGENCE—PROXIMATE    CAUSE—CONCURRENT NEGLIGENCE OF TRUCK DRIVER.
    *Liability of a railroad for injuries received by its passenger when single-car train collided with a truck at a grade crossing is dependent upon whether the railroad was causally negligent, whether the truck driver was or was not concurrently negligent.*

32. JURY—MISCONDUCT OF COURT PERSONNEL—DUE PROCESS.

*Acts of court officer and other personnel involving association with jurors, both in and out of the courtroom, held, to have constituted a denial to defendants of due process of law and to require a new trial.*

33. COSTS—NEW TRIAL.

*Costs of appeal are ordered to abide the final result, where new trial is granted.*

Appeal from Saginaw; Borchard (Fred J.), J. Submitted May 13, 1965. (Calendar Nos. 35, 36; Docket Nos. 50,654, 50,662.) Decided March 8, 1966. Rehearing denied April 5, 1966.

Declaration by Nina B. DeCorte against the New York Central Railroad Company, a Michigan corporation, Michigan Milk Producers Association, a Michigan corporation, and Elmer G. Myers for injuries sustained when a truck owned by Myers struck a train in which plaintiff was riding. Verdict and judgment for plaintiff. Defendants New York Central Railroad and Michigan Milk Producers Association appeal. Reversed as to defendant New York Central Railroad, the Court being equally divided as to entering a judgment for such defendant or granting new trial. Reversed and new trial granted as to defendant Michigan Milk Producers Association.

*Gilbert & Gilbert,* for plaintiff.

*O'Keefe, Braun, Kendrick & Finkbeiner (Larry C. Carl,* of counsel), for defendant New York Central Railroad Company.

*Stanton, Taylor, McGraw & Collison (John Davidson,* of counsel), for defendant Michigan Milk Producers Association.

DETHMERS, J. *(for reversal and entry of judgment for defendant railroad, for affirmance as to*

*defendant association*). Plaintiff was a passenger on defendant railroad's train. She was injured when it was struck by a milk truck owned by defendant Myers and driven by an employee of his. The truck was being operated under arrangements between Myers, certain dairy farmers, and defendant Michigan Milk Producers Association for picking up milk from the farmers and delivering it to designated receiving stations of the defendant association, hereinafter referred to as MMPA. Plaintiff included the latter as defendant on the theory that it was the employer of defendant Myers and his driver.

A jury returned a verdict of $31,518 for plaintiff against all the defendants. The defendants, other than Myers, appeal.

First, we consider defendant railroad's contention that there was not sufficient evidence to justify submission to the jury of the question of negligence on the part of the railroad. The relevant facts are that, in broad daylight, the train was traveling northwesterly at a speed of 65 miles per hour. The milk truck was traveling easterly, toward the track, at 40 to 45 miles per hour. They were approaching the crossing of the highway and the track. In the southwest quadrant of the crossing there were a house and a number of other buildings and trees which partially obstructed the view of the operators of motor vehicles approaching from the west of the crossing and engineers approaching it from the south. At a point 1,000 feet south of the crossing an engineer looking behind those obstructions could view a point on the road 500 feet west of the crossing. Proceeding north from there, the engineer's view became obstructed, except, however, that it was always possible for him to see the area within 50 feet west of the crossing.

Neither the truck driver nor engineer were alive at time of trial and so neither could be called to testify.

A man living in the house in the southwest quadrant was a witness for plaintiff. He testified that at the time in question he was in his house and heard the train whistle in prolonged fashion. He estimated, from the sound of the whistle, that when he first heard it the train was from 800 to 1,000 feet south of the crossing. Because the whistle continued to sound the witness concluded that something was wrong and so he looked out of a north window and saw the truck about 150 feet from the crossing, going 40 to 45 miles per hour. He then looked out of an east window and saw the train 75 to 100 feet from the crossing. The train did not decrease its speed at any time prior to being struck by the truck. The truck ran into the midsection of the left side of the car in which plaintiff was riding, causing it to be derailed and plaintiff to be injured.

There is no testimony to support a finding that the engineer did not maintain a reasonable and proper lookout. From the sounding of the whistle it might be inferred that he did see the approaching truck while view was still open to him behind the buildings. There is no testimony to show that at any point, while it was still possible to stop the train before collision, it became, or should have become, apparent to him that the truck was not going to stop before entering upon the crossing. There is no showing upon which to base the conclusion that at any time before it was too late the engineer should have been alerted and have realized that he could no longer rely on the assumption that the truck would stop before crossing.

In *Lake Shore & M.S.R. Co.* v. *Miller,* 25 Mich 274, this Court said (p 279):

"It is true there are some apparent qualifications or exceptions to this rule (that a party whose negligence has contributed to the injury cannot recover); thus, though the plaintiff is in fault by negligently driving upon the track of a railroad, or not using due diligence to get out of the way, yet, if he be seen by the engineer in time to avoid the injury by reasonable diligence in checking the train, the failure to do so would be treated as the proximate cause of the injury, if, from what the engineer could see, he had good reason to believe the plaintiff could not, or was not likely to, get off in time, or did not seem to be aware of the danger, and was therefore making no effort to avoid it. But if an engineer see a team and carriage, or a man, in the act of crossing the track far enough ahead of him to have ample time, in the ordinary course of such movements, to get entirely out of the way before the approach of the engine, or if he sees a man walking along upon the track at a considerable distance ahead, and is not aware that he is *deaf* or *insane,* or from some other cause insensible of the danger, or if he sees a team or man approaching a crossing too near the train to get over in time, he has a right to rely upon the laws of nature and the ordinary course of things, and to presume that the man driving the team or walking upon the track, has the use of his senses, and will act upon the principles of common sense and the motive of self-preservation common to mankind in general, and that they will, therefore, get out of the way; that those on the track will get off, and those approaching it will stop, in time to avoid the danger; and he therefore has the right to go on, without checking his speed, until he sees that the team or the man is not likely to get out of the way, when it would become his duty to give extra alarm by bell or whistle, and if that is not heeded, then, as a last resort, to check his speed or stop his train, if possible, in time to avoid disaster."

In *Buchthal* v. *New York Central R. Co.*, 334 Mich 556, this Court also said (p 562):

"Plaintiff contends that under the admitted conditions of good visibility the train crew, particularly the fireman and the engineer, charged with the duty of observing persons lawfully crossing the tracks and of maintaining a reasonable lookout, should have stopped the train when the car became visible. There was no duty upon the train crew to slow down the train or stop, even if they had seen the car. In *Piskorowski* v. *Detroit, G. H. & M. R. Co.*, 121 Mich 498 (80 Am St Rep 518), we held that a hand-car crew was not negligent as to a pedestrian unless they realized that the traveler would not stop and the crew have a right to assume that he will stop. We have held that at a country crossing there is no reason to slacken speed unless danger is apparent. See *Tucker* v. *Chicago & Grand Trunk R. Co.*, 122 Mich 149; *Knickerbocker* v. *Detroit, G. H. & M. R. Co.*, 167 Mich 596; *Rushford-Surine* v. *Grand Trunk R. Co.*, 239 Mich 19; *Tomes* v. *Detroit, T. & I. R. Co.*, 240 Mich 133. It is obvious that, under plaintiff's own testimony, had the train crew realized that the motorist intended to continue across the tracks it would have been too late to prevent the accident. Whether they made an actual observation becomes immaterial."

In *Rushford-Surine* v. *Grand Trunk R. Co.*, 239 Mich 19, this Court said (p 25):

"If the engineer had seen the truck when it came in view 50 feet back from the track and when the train was 500 or 600 feet from the crossing, and this is the most it can by any possibility be claimed he was bound to do, he would not have been bound to assume that the occupants of the truck would continue on their way and be required to stop the train. In *Knickerbocker* v. *Detroit, G. H. & M. R. Co.*, 167 Mich 596, it was said by Mr. Justice Ostrander, speaking for the Court:

" 'But it is not negligence—clearly it is not gross negligence—to fail to stop or to fail to gain complete control of a train of cars, merely because persons are seen approaching the track upon a highway on foot, or with vehicles. Such an approach is not usually evidence of negligence, and such persons are not usually in any peril.' "

The railroad has the right-of-way and the engineer might assume that the truck would stop until it became apparent that the truck could not or would not stop. There is no proof that this ever did or should have become apparent to the engineer in time to have enabled him to stop and avoid the accident. There was no evidence to go to the jury on the question of the railroad's negligence. Its motion for judgment *non obstante veredicto* should have been granted. We need not, therefore, discuss other charges of error prejudicial to that defendant. Case reversed as to defendant railroad with directions to enter a judgment of no cause of action in its favor, together with costs.

Defendant Myers has taken no appeal. We are left to consideration of the appeal of the Michigan Milk Producers Association. Its chief ground of appeal is that Myers, as owner of the truck operated by his employee, was, as a matter of law, not an agent, servant or employee of MMPA and, hence, that the latter is not liable for consequences of the collision and its motions for directed verdict and judgment *non obstante veredicto* should have been granted. Here further facts are to be noted. The MMPA is a farmer-owned and farmer-controlled marketing and bargaining cooperative. Its main function is to bargain in behalf of its dairy-farmer members for the sale of their milk to distributors and others and guarantee payment to the farmers for their milk sold through the association. Each farmer member has a contract with the association

to deliver his milk to the association at stations designated by it. The association collects from the purchaser and transmits to the farmers the amounts due them. Defendant Myers owned the truck and had a route of farmer members of the association with each of whom he had an agreement to haul their milk from their farms to association stations for a certain charge to be deducted by the association from their milk checks and paid by it to him. He had an assignment from each farmer directed to the association for such payment by it to him for that service. Myers says, and the association contends, that he had no contractual arrangement with the MMPA. The latter insists that there was no agency or employer-employee relationship between it and Myers because (1) there was no such contract between them, (2) because it had no control over him, and (3) because he was either an employee of the farmers for whom he hauled who had hired him and had full control over his hauling operations, with the power to terminate the relationship at any time, or he was an independent contractor, hauling for the farmers, whose duty it was to deliver the milk to MMPA stations, but he was not hauling for the MMPA.

On the question of an agency or employment relationship between Myers and the MMPA plaintiff concedes that the element of control is an important indicia of the existence of the relationship, but she points to testimony that MMPA required haulers such as Myers (1) to use its receipt books to receipt for milk received from farmers and to give one copy to the farmer and one to it, (2) to keep certain records of milk receipts as it directed, (3) to treat milk received in a certain manner, (4) to take milk samples for it, (5) to follow instructions of its fieldmen, (6) to prepare and furnish MMPA with certain records upon delivery of milk, (7) to have his tank washed, after milk delivery, by MMPA employees

with its detergents, et cetera, (8) to accept MMPA bulletins on milk producing problems and instruct farmers thereon, (9) to check farmers' milk-cooling systems and caution them on proper use of antibiotics, (10) to take orders from farmers for MMPA products, such as butter, and deliver same and obtain receipts therefor, (11) to pick up milk only from MMPA members to be delivered to MMPA stations, (12) to pick up from certain farmers and not from others and thus avoid competition with other haulers as directed by the MMPA fieldmen, (13) to haul milk only to stations as directed by MMPA and not to other ultimate purchasers of the milk, (14) to receive his pay from MMPA which deducted it from farmers' milk checks, (15) to engage as driver someone approved by MMPA, (16) to operate only one route and not two as he had been doing, (17) to sell route only to purchaser approved by MMPA, (18) to permit MMPA to take routes away from him without compensation. Also, (19) he had a MMPA decal on the side of his milk truck. It is not necessary for us to determine the matter as a question of law, nor does the trial court appear to have done so. Rather, it seems to have been treated as a question of fact submitted to and decided by the jury. We think the proofs, some of them as above outlined, were sufficient to require submission of the question to the jury. Doing so did not constitute error.

Next, MMPA complains of error in the court's permitting plaintiff to testify about the cries and bleeding appearance after the accident of other persons who were severely injured and killed by the collision, as explanatory of plaintiff's claim for damages for her resulting emotional disturbance, fright, and mental anguish. Defendant says that proofs show that some of these things seen and heard by her were by reason of her failure to promptly leave the car. Instead, she stayed for a

while to help other passengers.   Also, defendant
says her mental disturbance was shown to be due to
her subsequent loss of her husband.   At most, it
must be said that a question of fact was presented
as to cause and effect, whether due to defendant's
negligence or other occurrences.   Certainly plain-
tiff's charitable act in helping other passengers
should in no wise be held to destroy or diminish her
right to recover for mental anguish accompanying
forceful personal injury.   That such is a proper
basis for an award for damages is clear from this
Court's holdings in *Grenawalt* v. *Nyhuis,* 335 Mich
76, *Stewart* v. *Rudner,* 349 Mich 459, and *Mont-
gomery* v. *Stephan,* 359 Mich 33.   Defendant cites
*Hyatt* v. *Adams,* 16 Mich 180, for the proposition
that there can be no recovery for mental shock or
fright not accompanied by personal injury.   It is
inapt here because plaintiff did sustain personal
injury.   No error occurred in receiving said evi-
dence.

During trial a court officer from one of the other
courts in the circuit had gone into the room where
the jury deciding this case was staying.   He also
conversed with one of the jurors.   Beyond that, he
had transported plaintiff from her home to the court-
house and back.   A member of the jury panel, but
not one of the jurors in the case, was seen, during
course of trial, conversing with plaintiff in the court-
room.   Defendant claims that its motion for mis-
trial on this account should have been granted.   No
showing was made of any conversation by the court
officer with any juror prejudicial to the case.   None
of defendants availed themselves of the court's offer
to permit them to question the jurors in this connec-
tion during the trial.   It was not shown that any-
thing said or done in this connection by any party,
juror, or court officer pertained to the case or af-
fected anyone's rights therein.   While we think that

courts must exercise the utmost care so that not even the appearances of improper conduct occur, reversible error is not made to appear here and, hence, reversal on this ground is not allowed.

Defendant claims the verdict to be excessive. No benefit to bench, bar, or the public will result from detailing the force and violence of and extent of plaintiff's injuries and the nature of her resulting damages. We say only that a consideration of the record in that respect convinces us that no improper conduct or emotional appeal relating to damages occurred and that it does not appear that the jury was swayed by passion, prejudice, sympathy, or any other improper motive. The verdict is not shocking to our conscience. We do not deem it excessive.

Defendant complains of error in permitting evidence of its having, in effect, fired Myers after the accident. Plaintiff says it was material to the question of the relationship between them, and indicative of MMPA control over Myers in the milk-hauling enterprise. We think it was properly received.

Defendant refers to offers of evidentiary materials and comments by plaintiff's counsel that were ostensibly offered and made to show the nature of the relationship between MMPA and defendant Myers, but defendant says that it was but a ruse for the purpose of injecting into the minds of the jurors the corporate bigness and wealth of that defendant. Considering what defendant's counsel himself said to the jurors in that connection, we see here no reversible error.

Defendant urges that the court erred in allowing costs to be taxed by plaintiff more than 20 days after judgment was entered, contrary to GCR 1963, 526.10(2). Plaintiff counters with the fact that within those 20 days defendants received a 20-day stay of proceedings and filed motions for new trial

and for judgments *non obstante veredicto,* that the motions were denied and plaintiff filed proposed bill of costs within 20 days thereafter. The rule fixes the time for such filing within 20 days after entry of judgment, not after denial of such motions. The court erred in allowing the costs to be taxed as and when it did.

Except for the indicated taxing of costs, the case is affirmed as to defendant Michigan Milk Producers Association, with costs in this Court to plaintiff against the latter defendant.

Kelly and O'Hara, JJ., concurred with Dethmers, J.

Black, J. *(for reversal and entry of judgment for defendant railroad; for reversal and new trial as to defendant association).* This case presents three important questions.

The first is whether the judicially unrestrained misconduct of one of the three court officers of the three-judge Saginaw circuit,[1] brought out as it was in the middle of this long jury trial, amounted to imperative cause for declaration of a mistrial. I hold that it did.

The second is whether the plaintiff burden bearer has adduced proof on strength of which the jury was authorized to find that the defendant railroad company's engineer was actionably negligent. I hold with Justice Dethmers that she did not.

The last of such questions is whether the same burden bearer has adduced proof on strength of which the jury was authorized to find that the defendant Michigan Milk Producers Association was responsible for the truck driver's rather manifest

---

[1] See 374 Mich iv; PA 1961, No 236, § 511 (CLS 1961, § 600.511 [Stat Ann 1962 Rev § 27A.511]).—Reporter.

actionable negligence. I hold with Justice Deth-MERS that she did.

Since my sole disagreement with Justice Deth-MERS has to do with jury tampering, that subject only will be considered in this opinion.

On May 13, 1965, two like cases were orally argued and submitted in this Court. One was *Bunda* v. *Hardwick,* reported now in the 376th Michigan Report, commencing at 640. That one hailed from the St. Clair circuit. The other was the present case, DeCorte *v.* New York Central Railroad Company. It hails from the Saginaw circuit. In each case the record discloses discovery, as the trial went along, that an officer of the court was guilty of that kind of misconduct which, inevitably, gives rise to "suspicion the jury was being tampered with or might be tampered with."[2]

In each of the two cases counsel for the defendant party or parties moved immediately for a mistrial after having laid before the trial judge, at chambers, what was known of such misconduct. In each case the motion was denied with nothing done by the trial judge to arrest the officer's misconduct for the remaining days of the trial. In each case a substantial verdict was returned in favor of the plaintiff, upon which judgment was entered. In this DeCorte Case the amount of the verdict and judgment against two corporate defendants, plus an individual defendant, was $31,518. In the *Bunda Case* the amount of the verdict and judgment was $90,000. The latter was rendered and entered against an individual motorist, a car salesman, whose liability coverage as shown by statutory recognizance (see PA 1956, No 218, § 3036 [CLS 1961, § 500.3036

---

[2] These words are taken from *People* v. *Chambers,* 279 Mich 73, 80 presently quoted in full context.

(Stat Ann 1957 Rev § 24.13036)]) was limited to $20,000.[3]

I propose to examine the facts of this DeCorte Case first, conjoining that examination with what are believed to be settled principles the courts have set up to guard every litigant's right to the due process of jury justice, wholly free from off-the-record and highly improper associations of court officers with unsuspecting jurors. As for the *Bunda Case*, see "B.", The Bunda Case, *post.*

## A.

## The DeCorte Case

Seven years and eight months ago, the occasion being that of another neglect on the part of another judge of the Saginaw circuit to perform another order of superintendence (*In re Huff,* 352 Mich 402), this Court undertook to advise the trial bench that the constitutionally charged duty of superintending control (then Const 1908, art 7, § 4; now Const 1963, art 6, § 4) meant something more than a scented note. Preludial to enforcement of a courteously worded order of superintendence, we took time enough to go into the subject of judicial superintendence generally, the better to broadcast a determined and resolutely unanimous policy. By adoption of and comment upon the applicable text of American Jurisprudence and related authorities, we explained that the purpose of the constitutional mandate was "to keep the courts themselves 'within bounds' and to insure the harmonious working of our judicial system." *Huff, supra* at pp 417, 418.

Yes indeed. This Court is charged by the Constitution with the task of *insuring* the "harmonious [that means uniform] working of our judicial sys-

---

[3] See, also, CLS 1961, § 257.504(d) (Stat Ann 1960 Rev § 9.2204 [d]).—Reporter.

tem." Applying that isonomy to the case at bar, one must wryly observe that it is invidiously unfair that any civil or criminal litigant, the luck of whom happens to land the venue of his case in one of our few circuits where the opportunity for, if not the fact of, jury tampering by court officers seems to go on unchecked, should be denied the constitutionally exigent protection of our pertinent order of superintendence, an order this Court issued more than a year before the *Bunda* and DeCorte Cases were called up for trial. The order reads:

"In view of the fact a new trial will take place, we do not believe it necessary to answer the other questions presented, except to caution trial judges that bailiffs, sheriffs, and other court personnel should be warned about practices involving associations with jurors both in and out of the courtroom which might create the opportunity to influence their decisions." *People* v. *Kangas,* 366 Mich 201, 208.

The rightful answer to the first question in this case is foretold by that order. The order is based upon that principle of due process of law which inheres in the constitutional guaranty of trial by jury. Two courts, to which we are constitutionally devoted, have spoken grimly to the point:

"It is important that the officer be not guilty of any misconduct that could have influenced the jury, and that his conduct not furnish any ground for suspicion the jury was being tampered with or might be tampered with or was deliberating in his presence. It is not what the officer may have said or done any more than his mere presence with the jury that is or may be prejudicial to defendants and tend to cast suspicion upon the otherwise orderly administration of justice. *People* v. *Knapp,* 42 Mich 267 (36 Am Rep 438); *Churchill* v. *Alpena Circuit Judge,* 56 Mich 536," *People* v. *Chambers,* 279 Mich 73, 80, 81.

"The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. 'The jury is an essential instrumentality—an appendage —of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law'." *Turner* v. *Louisiana,* 379 US 466, 472 (85 S Ct 546, 13 L ed 2d 424).

This last was said with reference to constant association with the jury, throughout Turner's trial, of a number of deputy sheriffs. Two of the deputies were prosecution witnesses. We shall presently see officer Clark's likeness to them as he continued to "circulate around," with jurors in the Saginaw county courthouse, during this October 8 to October 25 (1963) trial.

Both in *Bunda* and DeCorte the Supreme Court of Michigan has been challenged by stark proof that two circuit court officers, one assigned to duty in the St. Clair circuit and the other in the Saginaw circuit, have been guilty [at very least] of those "associations with jurors both in and out of the courtroom which might create the opportunity to influence their decisions", associations the aforesaid order of superintendence was designed flatly to bring to an end. Whether the fault should be laid at the door of the circuit judge for failure of court-officer instruction, or at the door of the officer for contempt of instruction, is now immaterial. The result either way was a denial of due process of law. For *all* details of the proof of court officer misconduct in the *Bunda Case,* see division "D" of Justice Souris' opinion in *Bunda* (376 Mich 640, 665–668), plus the expose (division "B" *post*) of *subsequent* like misconduct on the part of the same officer in the same circuit. For cor-

responding *full* details of what occurred in this De-Corte Case, read on.

What will the Supreme Court of Michigan do about all this, so far as concerns the presently undecided DeCorte Case? Compel performance of the *Kangas* order[4] of superintendence in Saginaw county, or fail in such regard? The bench and bar are about to find out.

To be or not to be the superintendent of Michigan's "one court of justice." That is the question. This Court must either enforce an order it has issued, or confess that it no longer is up to the task section 4 of article 6 has cast upon it. Perhaps, though, that is a bit too blunt. So let me quote how the more delicately ordered Justice SOURIS has formulated our duty (*Bunda* v. *Hardwick,* 376 Mich at 668): "This latter point [failure of the trial judge to restrain his court officer from untoward fraternization with jurors] we emphasize, since apparently our admonition in *People* v. *Kangas, supra,* is not yet being heeded by all circuit judges."

I agree with such emphasis, and go on to observe that we are now at the crossroads of constitutional

---

[4] Viewing Justice ADAMS' separate opinion for affirmance of *Bunda* (376 Mich at 673, 674), our Brother seemingly deplores the activity of court officer Stewart, yet looks upon such activity as not rising to the dignity of reversible error. As for Justice O'HARA's separate opinion for affirmance of *Bunda,* (376 Mich 640, 673) which opinion Justice ADAMS expressly indorsed, see division "B." *post;* The Bunda Case.

Even Justice SOURIS, the noblest liberal of them all, was unable in *Bunda* to stomach any such subversion of the principle of trial by jury. Brother SOURIS must have foreseen that it will be only a matter of time before an identical record of court officer misconduct, exercised with result for the cause of a *defendant* in tort rather than a *plaintiff* in tort, comes up in step with ATA (formerly NACCA) screams that a *plaintiff,* not a *defendant,* has been hurt by similar misconduct of an uncontrolled court officer.

There should, of course, be no different rule for plaintiffs distinguished from defendants, or vice versa. See comment by the writer, supported by Justice T. M. KAVANAGH, in *Herman* v. *Ploszczan-ski,* 369 Mich 253, 260.

superintendence. Should we fail here, let no one prate again about "harmonious"—evenhanded that is—judicial superintendence in Michigan. It will be no more. Excepting judicial corruption itself, nothing can be more destructive of the right of both litigants to the right of trial by jury than wrist-slapping toleration of disclosed facts giving rise to a suspicion of abuse by a court officer of his special "opportunity for jury tampering." Any such toleration, written for this and related cases in delicate idiom, will encourage rather than terminate sly and unlawful communications no record, in our courts of record, will ever disclose.

Some of the tricks of this off-the-record business of court officer communication with, or listening to, jurors engaged in hearing a case can be so smoothly conducted that the unwarned juror does not realize he is being used. And when the opportunity for private communication, "opportunity" alone, lies with an uninstructed and uninhibited court officer, an officer found later to be friendly and in daily private contact with one of the litigants and his or her personally interested witnesses, an officer the judicially uncautioned juror or jurors would trust naturally as a representative of the court, then something more than a midtrial "stay out of that jury room" order to the offending officer is due imperatively. Due process of law, as some seem to forget, is not just owing to persons whose "life" or "liberty" is in jeopardy. It is owing as well to persons whose "property" is threatened (US Constitution, Amendments 5 and 14; Michigan Constitution 1963, art 1, § 17).

Court officer Clark was *not* in charge of this De-Corte jury. He was assigned to duty in the courtroom of Judge O'Neill and had no business associating in any way with the DeCorte jury, even to the

extent admitted by him. He was a friend of the plaintiff. He was secretly in action in her behalf, as this Court must presume from what he and the plaintiff admitted when their actions were brought to light. He was permitted from the beginning of the trial to associate each day with *all* of the jurors called to service in the Saginaw county courthouse, in the common jury room as well as outside that room. No pretense is made that he ever advised any judge that he was driving the plaintiff and her witnesses to and from the courthouse as the trial of this case proceeded. And all denials of impropriety fade before the fact that his actions, and those of the plaintiff, were discovered accidentally by *defense* counsel and brought to attention of the trial judge by them.

But counsel for plaintiff say they knew nothing about the court officer's activity, referring of course to what the officer and the plaintiff admitted on the separate record when they were called to account.[5] Accepting that as true, it bespeaks two conclusions of significance. The first is a strangely unusual want of daily strategic consultation of lawyer and client, as this lengthy trial proceeded. The second is an odious inference of furtive secrecy on the part of the plaintiff, that she didn't want even her own lawyers to know what the officer was doing as he assisted her and her witnesses to and from court.

Taking Justice Souris' *Bunda*-written epigram for a text ("and who knows what else", *Bunda* at p 667), who will ever know what court officer Clark may have privately communicated to the plaintiff and her witnesses, or what he may have privately communicated to the jurors, as the trial progressed? Who will ever know what settlement might have been

---

[5] The disavowals and disclaimers of counsel are quoted in full context, *post.*

agreed upon or rejected during the trial, had not
some juror's comment, upon the extent of Mrs. De-
Corte's injuries, been overheard and communicated
to the plaintiff by her court officer friend?[6]   Yes,
who will ever know, the trial judge having failed
to order a mistrial and then having failed aggres-
sively to separate officer Clark from his jury during
the remaining days of the trial, other than that the
jurors must as before have felt themselves free to
talk things over with officer Clark, an officer they
knew only as a trusted and unbiased representative
of the court?   To quote *Turner* v. *Louisiana* again
(379 US at p 474):

"It would have undermined the basic guarantees of
trial by jury to permit this kind of an association
between the jurors and two key prosecution wit-
nesses who were *not* deputy sheriffs.   But the role
that Simmons and Rispone played as deputies made
the association even more prejudicial.   For the rela-
tionship was one which could not but foster the
jurors' confidence in those who were their official
guardians during the entire period of the trial."

For some reason, attributable as it must be to
carelessness on the part of a few—just a few—of
our trial judges, this Court has been called upon
("frequently of late") to scan a rash of instances
where officers of court, seemingly without any judi-
cial instruction or superintendence whatever, have
violated at will the admonitions that were written
by Justices Cooley and Campbell as far back as
1879 and 1885 when *People* v. *Knapp* and *Churchill*
v. *Alpena Circuit Judge,* cited *supra,* entered our
books.[7]   These violations were due, must have been

---

6 The extent and prognosis of Mrs. DeCorte's injuries was a most
controversial topic and is reflected in the size of the verdict.   See
Justice Dethmers' opinion.

7 "The question of communications, either oral or written, from
third parties to the jurors in the jury room has been the subject of
several appeals to this Court in the last year.   This indicates the

due, to failure of trial judges to instruct and re-instruct *court officers* properly. There is no other way to explain the casual attitudes of officer Clark in DeCorte and officer Stewart in *Bunda* when they were called to account in chambers.

Now for the facts. The beginning of this prejudi-cial episode is described best by continuous copying of the record made at chambers prior to resumption of the trial on Wednesday morning, October 16, 1963.

"*Mr. Bowers* [*trial counsel for one of the defend-ants*] : Your Honor, this is a situation that has come to my attention partially by my own observations and partially by other information and that is with respect to the court officer of Judge O'Neill's court, apparently as an accommodation to the plaintiff in this matter, is transporting her at least home in the afternoon after the day's session.

"I have observed particularly yesterday on 1 or 2 occasions where the court officer, particularly yesterday morning, spent a great deal of time chat-ting with the jurors in the jury room.

"*The Court:* This is Judge O'Neill's court of-ficer?

"*Mr. Bowers:* Yes, the tall one. I don't know his name. The tall heavy set gentleman with glasses.

"*The Court:* Mr. Archie Clark.

"*Mr. Bowers:* I heard some of the conversation between him and some of the jurors which was not germane to their being called in yesterday for com-ing. In other words, it was a chit-chat conversation when he went into the jury room and talked with them on 2 or 3 occasions I know not what he said,

importance of calling to the attention of the entire trial bench their duty to preserve the secrecy of the jury deliberations." *Wilson* v. *Hartley*, 365 Mich 188, 190.

"We call to the attention of the trial judges of this State their duty to safeguard trial by jury from any suspicion the jury may be tampered with while deliberating. Frequently of late this Court has had similar incidents called to its attention by appeal in which there is reason to believe the opportunity for jury tampering was present." *People* v. *Kangas*, 366 Mich 201, 208.

but I would assume, I couldn't identify specifically, that in that time between 9:00 and 9:30 that there were jurors in there from this case.   In other words, as I understand this room across the hall is a congregation place for all jurors from all the courts?

"*The Court:*   That place plus the other jury room. We divided the panel up.

"*Mr. Bowers:*   But he was in this jury room across from this court on 2 or 3 occasions during the course of that half hour talking I know not what.

"The relationship of his apparently either being a friend or neighbor is a good accommodation or at least with convenience to the plaintiff or transporting her.   I don't know about coming to the courthouse, but I know of leaving the courthouse she riding with him.

"I think this relationship of occurrences is of such a serious nature that I feel compelled to move for a mistrial.   Now, notwithstanding my reluctance in going this far in that this is a rather long lawsuit, but I feel I must make this motion.   I don't know about the conversation, but under the circumstances I think it is completely out of order.

"*Mr. Donald Gilbert:*   Now, if the court please, it's our understanding that Mrs. DeCorte is staying with a daughter who apparently lives out that way and the only way that I know that was because I was at the office last night she was there and said she was going out Gratiot, and because I live out on the corner of Gratiot and Wheeler, that's the only knowledge that I have that she would live in that direction.   We have no knowledge of the fact that she has ever ridden with Judge O'Neill's court officer, but—so we can't admit or deny it, and if Mr. Bowers says that she has she probably has.

"*The Court:*   I think she should be called in here, too.

"*Mr. Davidson:*   I saw it myself.

"*Mr. Donald Gilbert:*   I think certainly we would instruct our client to discontinue that.   Now, I think at this point, if this is a serious motion, and I think

that it is, that the court officer ought to be called in here and make a record of what he has said to the jury and whether he has discussed this case.

"*The Court:* First of all I want her brought in and bring the court officer separately; see what matters were discussed, so if you would have her come in here."

Immediately following the above plaintiff Nina B. DeCorte was called into chambers. She was sworn, examined, and sent out. Then court officer Clark was called in, sworn, and similarly examined. While there are some discrepancies in the testimony given by the two (with respect to matters equally within their knowledge), it developed without question that Clark was 1 of 3 Saginaw county court officers that were working with *all* jurors called for the term; that he was an old friend of the plaintiff from the time he worked with her "at Morley Brothers back in '40 and '41 and '42"; that he had not only been driving the plaintiff to and from court on an uncertain number of occasions during the trial but, along with plaintiff, had been driving two of her witnesses to and from court; that the two witnesses were with Mrs. DeCorte as passengers on the rail car when it was struck by the milk truck; that he was, to say the least, not exactly inimical to the plaintiff's cause which then was in the course of presentation before the jury in Judge Borchard's court, and that he, Clark, was not the *court officer assigned to the De-Corte Case jury.* The testimony given by Clark disclosed further that he had been "in and out of there [the jury room identified above] a lot of times" during the previous week of the trial.

The testimonial denouement tells the rest of the story:

"*Q.* Well, Archie, you do go in there during recess time and chew the fat with the jurors?

"*A.* Lots of times I stop at the door.

"*Q.* You go in frequently?

"*A.* I have went in there and sit down in there.

"*Q.* And you did during this trial?

"*A.* I don't remember going in there.   Only one day we eat dinner in there.   Lots of times we couldn't get them all signed in.   We hunt and hunt all morning for a certain one, but I don't remember being in there for sitting down purposes.

"*The Court:* Of course I am going to instruct you at this time that you are not to go to either of the jury rooms unless it is on official business of the court.   I mean that's a place for the jurors to congregate and it is a place where they can meet and be out of the hallways so that they are not in the way of counsel and the litigants and witnesses in these particular cases."[8]

A curious as well as careful search of the whole record discloses that this was the *sole* occasion during the trial, *a trial having nine more days to run,* that Judge Borchard assumed to instruct either his own court officer or court officer Clark concerning association with the jurors that were sworn to hear proofs in the DeCorte case and render "a just verdict" thereon.   And a corresponding search of the record discloses that Judge Borchard at *no* time told the members of the jury that they were not to associate with *any* of the court officers during the trial, or that they had been sworn to receive all of their knowledge about the case *on the record in open court.* Further, there was no instruction that the jurors should report infractions and attempted infractions, of the above, at once on penalty of contempt.   See CLS 1961, § 600.1701 (Stat Ann 1962 Rev § 27A-.1701) particularly paragraph (8).

The trial actually went on, after submission and denial of the defendants' motion for mistrial, to a

---

8 This instruction was wholly insufficient if, indeed, any instruction might set right what had taken place.   See quotations, *post,* taken from the *Knapp* and *Churchill Cases.*

verdict with no claim by anyone that the trial judge bothered further to safeguard the integrity of the case from further tampering or opportunity of tampering—*by officer Clark*—with the jury.[9] Further comment upon this highly prejudicial situation would seem to be unnecessary. If it is, quotation from the cited cases of *Knapp* and *Churchill* will supply it.

"We have said enough already to show that it is not conversation alone that is mischievous; the mere presence of the officer within the hearing of the jury is often quite as much so. In one case what he would say might influence the verdict; in another, what his presence might restrain jurors from saying, might accomplish the same result." *Knapp* at pp 271, 272.

"It is, perhaps, difficult to say how far the court below could have overlooked the things complained of in the jury room, if they had stood alone. But we do not think there is any right to disregard what was done out of the jury room. The departure from the proper course of duty was not technical, but real and substantial, and involved several different kinds of acts of directly mischievous tendency, and whether the jury actually yielded to their influences against relators or not, there can be no presumption or ascertainment in any satisfactory legal way that this was not done. The annulment of the verdict was a matter of right." *Churchill* at pp 540, 541.

But it is said, by plaintiff's counsel, that Judge Borchard instructed the jury, at the end of each day, "not to discuss this case among yourselves nor with anyone else." If, prior to the time officer Clark's conduct was brought to attention at chambers, this was sufficient instruction, it was

---

[9] "The court did not direct Rispone or Simmons [the two court officers] to cease associating with the jury, and, so far as the record shows, the association continued for the remainder of the trial." *Turner* v. *Louisiana*, 379 US at p 470.

wholly insufficient thereafter. Officer Clark should
have been told that his conduct was contemptu-
ous, particularly on account of failure to report
to any judge the fact of his daily association
with the plaintiff and her witnesses and his daily
association with such of the jurors (not then in his
charge) as were engaged in hearing the plaintiff's
case. Not only should he have been told to stay out
of the jury rooms while *any* juror was there; he
should have been told on dire penalty to cease asso-
ciating with all jurors hearing the DeCorte Case.
And, since the judge ruled that the trial should go
on, it was even more exigent that he should tell
the jury all about what had been discovered and
made of record at chambers; also that he, the judge,
should instruct *his own court officer* to see that
Clark stayed away from and ceased all association
with the DeCorte jurors.[10]

The denials of misconduct, by officer Clark, mean
nothing. There is no way to prove or disprove what
goes on in a jury room, or outside a jury room, when
an easy, continuous and uncontrolled opportunity
for private communication, between jurors and a
court officer friend of one of the litigants, is dis-
covered or permitted. As the Court said in *Church-
ill, supra* at pp 539, 540:

"It is contrary to public policy to make inquisition
into the discussions or opinions of individual jurors.
If their acts are unlawful they may invalidate their
verdict, but their opinions and statements are privi-
leged, and no court can compel them to disclose them,
or draw them out from any of the others. If a
single juror is improperly influenced, the verdict is
as unfair as if all were. And if the court refuses

---

[10] All counsel have responded in the negative to this posed question:
"Does the original record show, anywhere, that the officer in charge
of the DeCorte jury was instructed by Judge Borchard to see that
court officer Clark stayed away from and ceased all association with
the members of the DeCorte jury?"

to relieve on account of its own view of the propriety of the verdict, it practically usurps the place of the jury and makes the verdict. Still less is it admissible to settle private rights on any assumption of the respectability or good character of jurors, or by any ex parte inquiries of the court."

One wonders whether there would be any hesitation over enforcement here *had the reverse of the present situation been shown.* Suppose the verdict had been in favor of the *defendants* after it had been discovered that court officer Clark had been driving the defendant railroad company's claim agent to and from court each day with two of the railroad company's witnesses and, in the meantime, had been associating similarly, in and out of the common jury room, with jurors engaged in the course of this DeCorte trial. Quite a question, that.

There is more here than ordinary reversible error. There was a denial to the defendants of due process of law. *Knapp* and *Churchill* verify that. Either this Court is going to enforce its 1962 order, that is, to warn bailiffs and other court personnel "about practices involving associations with jurors both in and out of the courtroom which might create the opportunity to influence their decisions," or it is going to fail miserably in its constitutionally assigned duty. It looks now, with the handing down of 4–3 *Bunda,* that omission of distasteful duty is preferable to performance of that duty.

The foregoing reminds that Justice Dethmers, along with the writer, was "taken in" originally by a cleverly truncated quotation which appears in the plaintiff-appellee's brief. The quotation, checked since, warns again that something important may be, and often is, concealed behind the forensic employment of that all too familiar trinity of asterisks, especially when it appears in the middle of a sentence. Let the compared graphics of brief, and

of full-context record, disclose the reverse of what we were led to believe.

(a) *Plaintiff-appellee's brief:*

"The Court, in chambers, inquired concerning the incident and permitted all counsel cross-examination of the officer and the plaintiff, at the conclusion of which inquiry the trial court said:

" 'Based on the information that has been brought to my attention I would at this time deny the motion for mistrial. Now I would go one step further. If counsel desires to question the jurors  *  *  *.'

"The offer to question the jurors was declined by all defendants. The appealing defendants who joined in the motion for mistrial attempt to make joint stock out of this instance and claim error on the denial of the motion for mistrial."

(b) *The contextual record:*

"(Whereupon Mr. Clark and Mrs. DeCorte left chambers.)

"*The Court:* Is there anything further in that regard?

"*Mr. Bowers:* Well, this is in the form of testifying and I've already said it before, and I'm not saying it particularly to the motion, but particularly to the Court's observation and that is not with respect to the court officer, but with respect to this gentleman that just left, Mr. Clark, that in a general sense of the word could mingle with them. I observed this to a great extent yesterday morning. Now, I can't say as to what was said, but as far as the contact of the oral or verbal contact with jurors was extensive yesterday morning.

"*The Court:* This is before—

"*Mr. Bowers:* 9:30

"*The Court:* 9:30. Of course that is the time when they are signing in.

"*Mr. Bowers:* Well, as I observed, your court officer was standing and signing in and handing out

the checks and Mr. Clark was sort of circulating around.

"*The Court:* Based on the information that has been brought to my attention, I would at this time deny the motion for a mistrial. Now, I would go one step further. If counsel desires to question the jurors, but I think we are stepping on—

"*Mr. Bowers:* I think so.

"*The Court:* —some very tender ground if we do that.

"*Mr. Donald Gilbert:* Could I state for the record on behalf of the plaintiff that so far as counsel is concerned, we knew nothing of this arrangement about riding with the court officer. Yet, I don't think it is a good situation, but we had no nothing [*sic?*] of it and we had not instructed our client in regard to it, and we're certain from our standpoint that it was entirely innocent as far as Mrs. DeCorte was concerned. I want that clear upon the record.

"*The Court:* She will be instructed.

"*Mr. Donald Gilbert:* She will now be instructed not to talk to the court officers or have any conversation with him. If it was the court officer in this court it could be more serious, but it still isn't a good situation. We have done what we can to hold up the sanity of these situations and certainly not have encouraged it and we are certain that it was an innocent arrangement and only a natural one to have in view of the fact that her daughter-in-law was already riding with the court officer, and who is not in any way connected with the court, the daughter-in-law.

"*Mr. Bowers:* There is one other item, Your Honor, that hangs over from yesterday.

"*Mr. Stanton:* Just a minute. I want the record to show that the Michigan Milk Producers join in this motion for a mistrial.

"*Mr. Carl:* Same, Your Honor, on behalf of the New York Central.

"*The Court:* Motion denied."

The trial judge made no "offer to question the jurors." To say that he did is deception, the quoted full context considered. Before his utterance was hardly started—the utterance counsel in their brief have cut in two by asterism—the judge realized how far out of order any such grilling of the jury by counsel would be, and said so. To say nothing of the impropriety of the idea that counsel should cross-examine the jurors part way through a trial, the judge must have perceived that any one of the trial-experienced law firms as were then in court for the defendants[11] would be regarded as having taken leave of their senses had they by such grilling assumed the risk of juror hostility without (at very least considering other cases coming up during the term) the protection of a precedent order of mistrial.

If there was to be any such "questioning" of the jurors, that should have been done by the judge himself after declaration of a mistrial, *after* all counsel had absented themselves, *after* the 12 jurors had been told of the court's having learned that officer Clark had been driving the plaintiff and her witnesses to and from court, *and it should have been done for the purpose of ascertaining, if possible, further facts for indicated disciplinary action.* The specific point is that, on the showing alone as made, defendants' right to a mistrial could not and now cannot be reasonably questioned. The showing fits *Churchill's* presumption (*Churchill, supra* at p 540) :

"That which has a manifestly dangerous tendency must be treated as presumptively mischievous, and there is in such a case as this no legal method of removing the presumption."

---

11 O'Keefe, Braun, Kendrick & Finkbeiner, of Saginaw, for the defendant railroad company; Stanton, Taylor, McGraw & Collison, of Saginaw, for the defendant Michigan Milk Producers Association, and Gault, Davison & Bowers, of Flint, for the defendant Myers.

A rough paraphrase of *Turner* v. *Louisiana,* *supra,* at page 473, will serve to conclude this view that something more than reversible error was committed when the trial judge refused to declare a mistrial. The paraphrase:

It is true that at the time he testified at chambers court officer Clark told the trial judge that he had not talked to the jurors about the case itself. But there is nothing to show what the officer discussed in his conversations with the jurors thereafter. And even if it could be assumed that the officer never discussed the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and this secret friend of the plaintiff at court. We deal here not with a brief encounter but with a continuous and intimate association throughout a 17-day trial—an association which gave plaintiff's said friend at court a continuous opportunity, whether exercised or not, of putting in a word or two for the plaintiff's cause, particularly for the extent of her alleged personal injuries, and a like opportunity to hear juror comments about the case for communication thereof to the plaintiff as he drove her home each day from the courthouse.

## B.

### The Bunda Case

I refer to *Bunda* for two purposes only. The first is to record certain additional facts pertaining to court officer Stewart's conduct that are not disclosed in the respective opinions of *Bunda* (376 Mich 640, 673, 674). The second is to suggest that 4–3 *Bunda* is no *precedent* for glossing over of court officer misconduct in cases such as DeCorte.

In *Bunda* the record shows that, immediately preceding that part of the record which Justice Souris has recorded on pages 665 and 666 (376 Mich), plaintiff's counsel opened the at-chambers investigation with these words:

"*Mr. Walsh:*    When I came back into the courtroom prior to the starting of the afternoon session my client, Mrs. Bunda, advised me that as she was sitting out in the courtroom she heard a man's voice ask in the jury room when Mr. Brown would appear in the case and another man's voice answer that he would not appear, in effect that he would not appear, that he had no insurance, *and as the client reports it to me the answering voice was the court officer.*"

Then, as Justice Souris has reported by quotation (p 665), came officer Stewart's *unsworn* denial of having said (to jurors in the jury room) that the other defendant (Brown) would not appear because he "had no insurance." Next came the officer's *unsworn* charge that Judge Kane [the other judge of the 31st circuit] was in the jury room at the time "playing euchre."

Now, since 4 members of this Court decided to ascertain the presence or absence of reversible error —in *Bunda*—by determining the *credibility* of officer Stewart's *unsworn* statements (see the opinions of Justices O'Hara and Adams, 376 Mich at 673, 674), the rest of the record of that officer's *subsequent* like activity should be recorded in our reports for the benefit of the profession. Others, at least, may wish to judge such *credibility* in the light of subsequent events.

By separate certified transcripts it was shown to the 7 participant Justices that officer Stewart resumed his practice of discussing cases being tried,

*with jurors in the jury room,* on two specific occasions.[12]

The first such occasion came out during trial of the case of Waite *v.* Port Huron, the same trial judge presiding. This time, *in the presence of officer Stewart,* a witness seated in the courtroom during the noon recess testified upon oath to hearing officer Stewart and certain of the trial jurors, all being in the jury room with the door open, discuss in detail certain features of the case being tried. Then the witness testified, in answer to this question:

"*Q.* Was anything else said about the judgment?
"*A.* Yes, at that time insurance was brought in in this fashion: That someone had mentioned about the city having to pay such a large amount of money and then someone mentioned, well, the city only pays the first thousand dollars and the remainder is paid by an insurance company and then this person went into great length discussing or telling that the city had to carry insurance and I think at this particular time a mention was made—I had a point; something that just slipped my mind right now."

None of this testimony was denied by officer Stewart. The trial judge said, "I do not doubt the testimony." A mistrial was ordered, with no record of instruction or admonition of the officer. That brings up the second occasion.

The second occasion of like activity on the part of court officer Stewart came out during trial of the case of Fetting *v.* Petz, the same trial judge presiding. The judge was advised again, at chambers, that officer Stewart during the noon recess was in the same jury room with some of the trial jurors,

___

[12] These certified transcripts were filed with our clerk and printed in a supplemental appendix. They definitely were before the Court, and use thereof was made during oral argument. This Court, by order entered May 14, 1965, denied plaintiff's motion to strike them upon plaintiff's allegation that they were "unrelated to the present case,"

where he, Stewart, was overheard commenting upon the testimony a medical witness had just given in the case. The difficulty was solved by the trial judge this way:

*"The Court:* I do not think we need a court officer at all. We got along without one in the other case. Do you know of any reason we should have one?

*"Mr. Bush:* No.

*"Mr. Mugan:* No.

*"The Court:* I do not see any reason to have one for any case myself. * * *

*"The Court:* Well, in this case there is nothing particularly that is going to happen, so we will get along without the officer in this case. You were tied up with the other one anyway, most of it.

*"Mr. Stewart:* There is nothing wrong with that, no. I can go play golf.

*"The Court:* All right."

Things judicial have reached a pretty low state in Michigan when, to avoid the continued baleful influence of an officer of the court upon the sanctity of the right of trial by jury, it is thought judicially advisable to go without a court officer rather than declare a mistrial and attend to a bit of disciplinary action.

Is *Bunda* a precedent for finding no error, so far as concerns the activities of court officer Clark? First, see *Keenan* v. *County of Midland,* 377 Mich 57, for the precedential worth of a decision indorsed by four members only of this eight-man Court. Then consider that Justice O'Hara, writer of the key opinion for affirmance of *Bunda,* has since vainly moved that the defendant-appellant's application for rehearing be granted, followed by formal registry of his dissent from denial of such application.[13]

---

[13] See the Court's order denying rehearing of *Bunda* (Justices Kelly and Black not participating), dated February 8, 1966.

Something else needs attention. Being now a 40-year member of the St. Clair County Bar Association, I simply cannot pass, without comment on our record, the serious charge court officer Stewart made against the veteran and now deceased senior judge of the 31st circuit when he, the officer, was taxed with misconduct (see 376 Mich at 666). Uttered at it was without the administration of an oath and in the *absence of the accused judge,* the charge has been left to fester on our record without due investigation. It should be "called."

Having practiced steadily before Judge Kane and having some knowledge of the judge's understanding of judicial propriety, I am unwilling to accept, quite as casually as have 4 of my Brethren, officer Stewart's *credibility* in above regard. And since Judge Kane is not here to defend himself, let me lay that charge out in cold print:

It is said that Judge Kane was in Judge Streeter's jury room; a room that may be entered and left only from Judge Streeter's courtroom; a jury room which is physically and roundabout separated from Judge Kane's courtroom and corresponding jury room; that Judge Kane was playing cards with jurors then engaged in a trial presided over by Judge Streeter; that Judge Kane knew the court officer was present in the room at the time; that Judge Kane heard whatever was said about insurance applicable to the case being tried; that he failed to report it to the trial judge and that he simply kept silent.

All this was alleged by a court officer who was caught (on three separate and recorded occasions) doing what no officer of a circuit court (judges included) should ever do, that is, enter a jury room for any purpose while a juror or jurors sworn to hear and decide a case are there, much less talk to them or listen to their comments and answer their ques-

tions about the case being tried. Enough for his accusation, and enough for the *Bunda Case.*

My vote is for reversal of the judgment against the defendant railroad company and for entry below of a judgment with allowance of costs in its favor. As for plaintiff's cause against defendant Michigan Milk Producers Association, I would reverse and remand for new trial, leaving the matter of costs as between plaintiff and that defendant to abide the final result.

T. M. Kavanagh, C. J. (*for reversal and new trial as to both defendant railroad and association*). We respectfully disagree with Justice Dethmers with respect to the reversal of the trial court's order denying defendant railroad's motion for judgment *non obstante veredicto* and the direction to enter a judgment of no cause for action in its favor on the theory there was no evidence to go to the jury on the question of the railroad's negligence. We also disagree with Justice Dethmers' conclusion that the court officer's association with jurors did not constitute reversible error.

We believe the following evidence justified submission to the jury of the issue of the railroad's negligence. There was competent evidence tending to show that the truck driver was unaware of the approaching train. One witness stated positively that the truck never slowed down until the impact occurred. There was conflicting testimony as to the extent of obstruction of the railroad engineer's view of Barnes road and the truck as the truck approached the railroad track.

Defendant New York Central Railroad Company's exhibit No 62 shows a whistle post some 1,398 feet south of the point where the railroad intersects Barnes road. Testimony showed the engineer gave his customary 3 short blasts at the blow post and

then immediately held on to the whistle in a prolonged or distress signal until the impact. There was evidence tending to prove that the train was some 1,000 feet from the crossing when the distress signal was first sounded.

New York Central's expert witness testified that the so-called train was not a normal train, but a single unit car, 85 feet long, commonly referred to as a "beeliner" passenger coach.

The train's speed recorder illustrated that the "beeliner" maintained a steady 65-mile-per-hour speed right up to the point of impact. New York Central's expert witness further testified that the "beeliner," traveling at a speed of 65 miles per hour, could have come to a complete stop in a distance of 1,230 feet. On cross-examination, this witness admitted that by applying the brakes at a distance of 1,000 feet (approximately the distance at which the distress signal was commenced), the train would have slowed down sufficiently so that upon reaching the intersection the truck would have been 460 feet beyond the railroad intersection.

The testimony of Mr. Duford Heidt, whose farm home is located south and west of the intersection of defendant's railroad track and Barnes road, and whose testimony is buttressed by that of other witnesses, appears to be crucial in this case. His ability to estimate speeds and distances is little short of remarkable.

Witness Heidt estimated the speed of the truck to be about 40 to 45 miles per hour.

Another witness, Horace Johns, a mailman, observed the truck some 500 feet from the intersection of the railroad. He placed the truck's speed at "at least 40 miles an hour."

Witness Heidt testified that the train was traveling at a rate of at least 65 miles per hour. The train's speed chart showed the train was traveling at

a steadily sustained speed of 65 miles per hour right up to impact. Heidt also testified that the train started blowing its distress signal at Maxwell Jensen's crossing and that Jensen's crossing was about 1,000 feet from the intersection of Barnes road.

Charles Dittmar, another of plaintiff's witnesses, testified that he paced off 1,000 feet south from the intersection of the railroad and Barnes road and that there was a farmer's crossing (Jensen's crossing) within 30 feet of that point.

Witness Heidt testified that the distress signal first sounded about 1,000 feet from the intersection. On cross-examination he was asked:

"*Q.* The train whistles normally start about 1,000 feet from the crossing?

"*A.* No, further than that when they start; when they just jerk them short blasts."

Defendant's exhibit No 62 shows that the blow post is 1,398 feet from the intersection. Here again Duford Heidt's testimony is supported by the exhibit.

Other testimony and that of Heidt established the fact that when the "beeliner" was 1,000 feet from the intersection the milk truck was 693 feet from the intersection. Heidt's testimony further established that at that distance there was no obstruction of the view of either the truck driver or the engineer. Heidt testified he heard the usual railroad whistle required by statute to be used at the quarter mile post and that the engineer held the whistle in a steady, prolonged blast which was so unusual to this man who has lived in the area for 45 years, that he made his observations after going to the north and east windows of his home. It was his perception that the prolonged whistle occurred right after the statutory signal had been given. He concluded from

this that the prolonged whistle occurred while the train was about 1,000 feet from the intersection.

On the basis of the foregoing evidentiary facts, on favorable view, we believe the jury would be justified in concluding not only that the engineer should have seen the truck approaching, and that he did see the truck approaching while the train was 1,000 feet from the intersection, but also that the engineer had reason to believe the truck could not, or was not likely to stop in time to avoid collision, and for that reason the engineer blew the whistle on the "beeliner" in such a prolonged fashion. The significance of the prolonged blast of the whistle is that it indicated, at least sufficiently for the jury to so find, that the engineer was aware of an apparent danger, that he realized the truck driver intended to continue across the tracks instead of stopping. In other words, the prolonged blast of the whistle provided some evidence that the engineer was aware of a danger which it then became his duty to exercise due care to avoid.

In view of the testimony as to the ability to stop the "beeliner," and in view of the testimony that by reducing the speed of the "beeliner" even 10 miles per hour the truck would have crossed in front of the "beeliner" before the "beeliner" got to the intersection, together with other evidentiary facts, it was entirely appropriate for the jury to conclude that the engineer, in the exercise of due care, should have done something more than merely continue blowing his whistle.

From the evidentiary facts above indicated, we believe the jury could conclude that defendant's engineer continuously observed the oncoming truck for some 1,000 feet down the track during its entire approach to the railroad crossing except while the engineer's view was blocked passing the Heidt buildings.

These facts and the inferences a jury is entitled to draw therefrom created the issue for the jury to decide as to whether defendant New York Central's engineer was negligent in the instant case.

44 Am Jur, Railroads, § 509, pp 749, 750, states the general rule as follows:

"When it is apparent, or when in the exercise of reasonable diligence commensurate with the surroundings it should be apparent, to the company that a person on its track or about to get on its track is unaware of his danger or cannot get out of the way, it becomes the duty of the company to use such precautions, by warnings, applying brakes, or otherwise, as may be reasonably necessary to avoid injury to him."

In the case of *Fike* v. *Pere Marquette Railroad Co.*, 174 Mich 167, 208, Justice Stone stated:

"Whether plaintiff was in a position of danger a sufficient length of time to have been seen by defendant's engineer, and to have enabled him to stop the train, was a question for the jury."

It should be noted that in the case before us the negligence of the truck driver, whether contributory or concurrent, could not bar plaintiff's recovery since her right of recovery as to defendant railroad company depends solely on whether the railroad was causally negligent.

Our Michigan cases have numerous times pointed out that it is negligence for the train operator to take no evasive action when it is apparent to him that a person or his vehicle is in danger and unaware of his peril. *Labarge* v. *Pere Marquette R. Co.*, 134 Mich 139; *Fike* v. *Pere Marquette R. Co.*, 174 Mich 167; *Bladecka* v. *Bay City Traction & Electric Co.*, 155 Mich 253.

Justice Black, writing for a majority of this Court, in *Leman* v. *Grand Trunk Western R. Co.*,

370 Mich 521, 530, testing a motion for judgment *non obstante veredicto,* said:

"Whether the engineer, as he moved the locomotive toward the pavement with timely knowledge that the Leman car was approaching—on that same pavement—at trunk line speed, should have stopped and accorded the car initial passage, was a question for the jury rather than the trial judge. In short, the proof fully justified the jury's implicit finding that each driver—one a motorist and the other an engineer—negligently, causally and mistakenly figured the other would stop and accord his vehicle the first right of passage. It follows that there was an ample sufficiency of evidence upon which the jury could find, as it did, that the engineer and the automobile driver were causally negligent."

Again, Justice Black, writing in *Bauman* v. *Grand Trunk W. R. Co.,* 376 Mich 675, having recited an evidentiary statement of facts far less compelling than the instant case, said (p 701):

"Now that theory of negligence and causation, supported as it was by the quoted and identified proof, provides legal right to jury determination thereof no matter what a judge or judges might do later on motion addressed to the clear weight of all of the proofs (*Woodin* v. *Durfee,* 46 Mich 424). See to the legal point *Labarge* and *Fike, supra;* also the grade crossing cases of *Grand Trunk R. Co.* v. *Ives,* 144 US 408, 429, 430 (12 S Ct 679, 36 L ed 484); and *Dunn* v. *City of Detroit,* 349 Mich 228. Submitted to a duly instructed jury, such theory and proof would authorize a verdict that the proximate and therefore sole cause of plaintiff's injuries was culpably continuant failure of due lookout to the fore, by defendant's engineer, and consequent omission of what otherwise easily could and therefore should have been done by him, that is, brake and stop the train well short of the highway crossing ahead."

The other allegations of error raised by defendant railroad company are answered in this opinion or in the opinion of Justice Dethmers and do not require any further discussion.

We agree with Justice Black that the acts of the court officer and other personnel *in this case* involving the practice of association with jurors, both in and out of the courtroom, constituted a denial to the defendants of due process of law and requires the granting of a new trial as to defendants New York Central Railroad Company and Michigan Milk Producers Association.

We vote for reversal of the judgment as to both defendant railroad company and defendant Michigan Milk Producers Association and remand for new trial as to both defendants, leaving the matter of costs as between plaintiff and the defendants to abide the final result.

Souris, Smith, and Adams, JJ., concurred with T. M. Kavanagh, C. J.