904 F.2d 36
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cynthia HOTCHKISS, Plaintiff-Appellee,
v.
NATIONAL RAILROAD PASSENGER CORPORATION, Defendant-Appellant,
Consolidated Rail Corporation, Defendant.
 No. 88-1884.
 United States Court of Appeals, Sixth Circuit.
 May 29, 1990.
 
 Before BOGGS and ALAN E. NORRIS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Cynthia Hotchkiss filed this wrongful death diversity action against the National Railroad Passenger Corporation and the Consolidated Rail Corporation (hereinafter collectively referred to as "Conrail") alleging that Conrail was negligent in a collision between a small snowplow and a train at a railroad crossing in Kalamazoo, Michigan. Plaintiff's husband, Michael Hotchkiss, driver of the snowplow, was killed. Conrail appeals the jury verdict finding plaintiff's decedent 65% negligent and Conrail 35% negligent. Because we conclude that plaintiff was unable to establish any breach of duty and failed to produce evidence of proximate cause, we reverse the judgment in the amount of $260,000 (calculated pursuant to Michigan's comparative negligence law) in favor of plaintiff entered by the district court upon the jury's verdict.
 
 I.
 
 2
 Michael Hotchkiss was employed by Western Michigan University as a light equipment operator. At approximately 11:00 a.m., on the day of the accident, February 8, 1982, Hotchkiss was operating a Bobcat snowplow, clearing snow from a sidewalk along the east side of Oliver Street, near the intersection of Oliver and Stadium Avenue. Oliver Street is a roadway running north and south, while Stadium Avenue runs east and west. Forty yards north of the intersection, a double set of railroad tracks runs east and west, parallel to Stadium Avenue, and crosses Oliver Street. The tracks angle slightly to the north about 1,200 feet west of the crossing. Conrail's train was traveling eastbound on the southernmost set of tracks.
 
 
 3
 At approximately 11:10 a.m., Hotchkiss drove his snowplow north across the railroad tracks, dumped a load of snow, and turned his snowplow around and headed south, back across the tracks and into the path of the train. At least six eyewitnesses viewed the collision from different vantage points. It is undisputed that warning bells were sounding, warning lights were flashing, crossing gates had been lowered, traffic had stopped on Oliver Street in both directions, the train's engine blew its horn twice as it approached the crossing, and its headlight was on. Hotchkiss was wearing protective headphones to shield himself from the noise produced by the snowplow. While the witnesses agreed that Hotchkiss headed north through the crossing, and then spun around and proceeded back south through the crossing (as he was southbound on the east side of Oliver Street, the crossing gate and flashers for southbound traffic was on the other side of the street), their estimates of Hotchkiss's position north of the tracks substantially differed. The witnesses also disagreed as to whether, and for how long, Hotchkiss hesitated as he approached the tracks heading south, and whether he was attempting to race the train.
 
 
 4
 Robert Rhoades was in the first southbound car stopped at the crossing on the north side of the tracks, and was the nearest witness to the accident. Rhoades approached the crossing as the warning lights began to flash and the crossing gates began to lower. He first saw the snowplow on the sidewalk on the south side of the tracks dumping snow. Rhoades testified that the snowplow proceeded north across the tracks, plowing snow as it crossed, and stopped about ten feet north of the tracks, even with the north crossing gate on the west side of Oliver Street; that the snowplow dumped the snow in its bucket, rocked back or moved back slightly, and then spun around clockwise; and that, as it approached the tracks, it hesitated at least ten seconds and then proceeded across the tracks at a steady pace into the path of the oncoming train. Rhoades thought that the snowplow was attempting to beat the train.
 
 
 5
 Another witness, Rodney Brownell, was operating a vehicle which was eastbound on Stadium and had stopped for the traffic light at that road's intersection with Oliver. Brownell testified that, as he approached the intersection, the snowplow was on the north side of the tracks dumping snow; that the warning bells, flashers and guards were activated by this time; and that, from his vantage point about forty to fifty yards away, he believed the snowplow stopped about three to four feet north of the tracks when it dumped the snow. Brownell observed it turn clockwise and proceed back south towards the tracks. He did not recall the snowplow hesitating before heading back across the tracks to the south, and said Hotchkiss acted as if he had not seen the train.
 
 
 6
 Thomas Raak was a passenger in a car stopped in the northbound lane of Oliver at the traffic light, just south of the intersection. He first observed the snowplow as it proceeded south across the tracks. He testified that he saw the snowplow's bucket bounce as it crossed the tracks and wondered, along with the driver of the car, whether the snowplow would safely make it across. Raak was unwilling to hazard a guess as to the position of the snowplow on the north side of the tracks but thought the entire episode lasted between twenty to twenty-five seconds.
 
 
 7
 Brian McDaniel was standing on the sidewalk next to Raak's car on the southeast corner of the intersection. He saw the snowplow depositing snow up against a pole on the north side of the crossing, about thirty to forty feet north of the crossing. McDaniel testified that the snowplow spun around, paused for approximately five to ten seconds, and then proceeded onto the tracks and into the path of the train. From the snowplow's hesitation in front of the tracks, McDaniel thought the operator had seen the train but that he had proceeded onto the tracks anyway. He said he heard the train blow its horn several times after the snowplow started moving again.
 
 
 8
 Mark Milnes and Richard Bean were walking west on the sidewalk along the north side of Stadium, towards its intersection with Oliver Street. Bean testified that they were approximately forty to fifty yards east of the intersection when they witnessed the collision. Milnes first observed the snowplow on the north side of the tracks heading south, about three to four seconds before impact. He heard the train whistle blow twice, and saw the snowplow speed up as it approached the tracks; he or Bean commented to the other that the snowplow was attempting to beat the train. His first impression was that the snowplow was going to make it safely across. Bean testified that he first observed the scene between ten and twenty seconds before the accident. He thought the snowplow was about five to fifteen feet north of the tracks when he first observed it, and said the snowplow was moving slowly until it hit the northernmost set of tracks, after which it sped up as if to beat the train. He did not see the snowplow hesitate when it approached the crossing but he noted that it almost made it across.
 
 
 9
 Plaintiff asserted several theories on which the railroad was negligent. First, she maintained that Hotchkiss was in a "position of danger" near the tracks and the railroad failed to reasonably respond to his presence near the tracks. Second, she argued that the train was being negligently operated at an excessive speed. The third theory--that the railroad had a duty to petition the Michigan Department of Transportation for pedestrian crossing guards over the sidewalk--was rejected in a special verdict.
 
 
 10
 Federal Railroad Administration regulations allowed a permissible speed of 80 m.p.h. at the Oliver Street crossing, based upon the track size, ballast, and type of train. Federal courts that have considered the issue have concluded that these speed regulations establish a maximum speed limit and preempt local, but not state, speed limits, and do not purport to set a speed reasonable under all circumstances. The railroad had established a timetable speed of 60 m.p.h. at the Oliver Street crossing, which decreased to 30 m.p.h. approximately one-quarter mile east of the crossing as the tracks enter an area with heavier traffic.
 
 
 11
 The three eyewitnesses who hazarded a guess at the train's speed--McDaniel, Milnes, and Bean--estimated it as between 40-60 m.p.h. Another, Raak, stated it was "normal" speed. A police officer monitoring traffic speed nearby had seen the train at another crossing shortly before the accident and estimated its speed at 55 m.p.h. The train's engineer testified that he was traveling less than 60 m.p.h. as he approached the crossing. Plaintiff's counsel, however, on cross-examination, pointed to the police accident report which recorded the engineer as stating he was traveling 60 m.p.h. at impact, after having applied his brakes.
 
 
 12
 The engineer stated that he applied the brakes near the point at which he came around the curve in order to conform to the decreased timetable speed of 30 m.p.h. east of the Oliver Street crossing, and not in response to anyone's presence at the tracks. He also blew the horn twice as part of the standard procedure for approaching a crossing, and testified that he first saw the snowplow as he rounded the curve 1,200 feet west of the crossing, at about the same time he started braking. The snowplow was then on the north side of the tracks, headed away from the tracks in a northerly direction, and he testified that he therefore did not consider it a danger. He then turned his attention down the tracks to the switch west of the crossing to make certain the tracks were properly aligned, looked at the south side of the tracks for vehicles, and then returned his attention to the north side of the tracks and noticed the snowplow had made a sudden and unexpected change of direction and was now headed south, back towards the crossing. The engineer said, "I hit the emergency brake when it was evident he wasn't going to stop clear of the eastbound main."
 
 
 13
 Plaintiff's expert witness, a professor of physics, testified that, based upon his reconstruction of the accident, if one were to credit the testimony of the engineer and his statement on the police report, the train could have been traveling as fast as 68-70 m.p.h. if the engineer began his initial brake application at 1,200 feet in order to bring its speed down to 60 m.p.h. at impact; or 60 m.p.h. throughout if brakes were not applied. Under either of these scenarios, the train would have been traveling 60 m.p.h., the timetable speed, shortly before application of the emergency brakes.
 
 
 14
 Plaintiff maintained, however, that 60 m.p.h. was an unreasonable speed for the crossing and proffered an expert who testified that 45 m.p.h. was an appropriate speed for the crossing. A speed-recording device was mounted on the train but the tape recording its speed was lost during a transfer of files from Amtrak to Conrail. Hotchkiss's counsel repeatedly suggested to the jury that Conrail intentionally lost the speed tape to conceal the train's true speed. The district court excluded, as unduly prejudicial and hearsay, an internal Conrail memorandum referring to readings from the speed tape, but gave an instruction permitting the jury to draw an inference adverse to Conrail from the loss of the tape.
 
 II.
 
 15
 Plaintiff's first theory of recovery was that the engineer failed to respond reasonably to the snowplow's presence near the tracks. She maintained that the snowplow was in close proximity to the tracks during the train's approach and, based upon its proximity, the engineer had a duty to slow the train. She also argued that the Oliver Street crossing was visible from 2,475 feet west of the crossing and that a brake application made anywhere from 2,400 feet to 1,200 feet west of the crossing while the snowplow was in a "position of danger" would have prevented the accident.
 
 
 16
 Michigan cases hold that it is negligence for a train operator to take no evasive action when it is apparent, or in the exercise of ordinary care should be apparent, that a person or his vehicle is in a "position of danger." Fike v. Pere Marquette R. Co., 174 Mich. 167, 140 N.W. 592 (1913); Labarge v. Pere Marquette R. Co., 134 Mich. 139, 95 N.W. 1073 (1903). The "position of danger" rule is a variant of the last clear chance doctrine.[1] A plaintiff who has placed himself in a dangerous position can still recover from a railroad if the railroad's negligence was antecedent to that of the plaintiff's and the plaintiff's danger could have been discovered through the exercise of due care. See LaCroix v. Grand Trunk W. R.R. Co., 379 Mich. 417, 152 N.W.2d 656 (1967).
 
 
 17
 The duty of the engineer to take evasive action, however, is qualified by certain presumptions. An engineer is entitled to presume that a vehicle on the tracks will get off, or that a vehicle approaching the tracks will stop in time to avoid the danger, until it becomes apparent that the vehicle cannot or will not stop. Until it becomes apparent the assumption is incorrect, an engineer may assume that a person or vehicle on or near the tracks will exercise ordinary care. DeCorte v. New York Central R. Co., 377 Mich. 317, 326-28, 140 N.W.2d 479, 481-82 (1966); Buchthal v. New York Central R. Co., 334 Mich. 556, 55 N.W.2d 92 (1952); Tomes v. Detroit, T. & I.R. Co., 240 Mich. 133, 215 N.W. 308 (1927); Bonner v. Grand Trunk W. Ry. Co., 191 Mich. 313, 319-20, 158 N.W. 3 (1916). When a person or vehicle is on the tracks, as opposed to approaching them, an engineer is bound to slow or stop the train for those who are apparently unaware of the danger and do not hear or notice warning signals, Bouwmeester v. Grand Rapids & Indiana R.R. Co., 63 Mich. 557, 30 N.W. 337 (1886), or for a vehicle obviously disabled or unable to extricate itself from the tracks because of surrounding traffic, Dunn v. City of Detroit, 349 Mich. 228, 84 N.W.2d 501 (1957).
 
 
 18
 Accordingly, we reject plaintiff's contention that the engineer had a duty to slow the train more than 1,200 feet west of the crossing, or at any other point for that matter, until it became apparent that the snowplow could not or would not stop. DeCorte, 377 Mich. at 326-28, 140 N.W.2d at 481-83; Buchthal, 334 Mich. at 562, 55 N.W.2d at 95. When the train was 1,200 feet west of the crossing, the snowplow had crossed the tracks heading north. The engineer testified that, at that point, he perceived no danger since the snowplow had apparently just crossed the tracks and was headed away from them. If Michigan law does not require the engineer to brake upon sighting a vehicle approaching the tracks, surely it does not require the engineer to brake when he sights a vehicle headed away from tracks. As a matter of law, a vehicle which has crossed and is headed away from the tracks is not in a "position of danger" so as to require the engineer to take immediate action.
 
 
 19
 The engineer further testified that, having observed the snowplow headed away from the tracks, he turned his attention to the alignment of the switch, and to the south side of the tracks. When he returned his attention to the north side of the tracks, he observed that the snowplow had made a sudden and unexpected change of direction and was now heading south. At that point, he applied his emergency brakes. Witnesses testified the snowplow had dumped its bucket of snow and spun around towards the south. Although several witnesses testified that it appeared the snowplow hesitated, then attempted to "beat" the train, viewing the evidence in the light most favorable to the plaintiff, the snowplow dumped its bucket of snow within three to four feet away from the northernmost set of tracks, spun around, and proceeded south without hesitation back into the crossing.
 
 
 20
 It is undisputed that at this time warning bells were sounding, warning lights were flashing, crossing gates were lowered, traffic had stopped on Oliver in both directions, the engine had blown its horn twice, and its head lamp was lighted. Plaintiff did not contend that the engineer had failed to properly apply his emergency brakes or that the brakes were inoperative; only that the snowplow's proximity put her decedent in a position of danger to which the engineer was required to react. Assuming the snowplow was operating in close proximity to the tracks, under Michigan law the engineer had no duty to take immediate action until it was evident that the snowplow intended to proceed across the tracks. DeCorte, 377 Mich. at 326-28, 140 N.W.2d at 481-83; Buchthal, 334 Mich. at 562, 55 N.W.2d at 95. Michigan's position of danger cases have been limited to persons on the tracks (see, e.g., LaBarge; Fike ), and pedestrians walking alongside the tracks or roadway (see, e.g., Richardson v. Grezeszak, 358 Mich. 206, 99 N.W.2d 648, 655-56 (1959); Martin v. Leslie, 345 Mich. 305, 76 N.W.2d 71, 74 (1956)), who were in immediate and imminent danger from the approaching train.
 
 
 21
 By contrast, an adult operating a small vehicle in close proximity to, but on the other side of, a double set of tracks is not similarly situated because he is not in any imminent danger. Only when the snowplow began to proceed across the tracks did it put itself in a position which required the engineer to act. Permitting liability on the theory the decedent was in a position of danger under the circumstances of this case would be an unwarranted extension of the last clear chance doctrine and would necessarily obviate Michigan's rule allowing the engineer to assume that an approaching vehicle will stop until it is apparent that the vehicle cannot or will not stop. Accordingly, we conclude that the engineer had no duty to slow or stop the train until it became apparent that the snowplow did not intend to stop for the tracks.
 
 III.
 
 22
 Hotchkiss's second theory of recovery was that the train was traveling at an excessive speed under the circumstances. In Michigan, whether a train is operating at a reasonable speed through a crossing is generally a question for the jury to consider in light of all the relevant circumstances. Hudson v. Grand Trunk Western Ry. Co., 227 Mich. 1, 3, 198 N.W. 339 (1924); Lamb v. Pere Marquette Ry. Co., 221 Mich. 273, 191 N.W. 227 (1922). Relevant circumstances include (1) the location of the crossing in a densely or sparsely populated area, Buchthal v. New York Central R. Co., 334 Mich. 556, 55 N.W.2d 92 (1952); (2) the presence or absence of warning or protective devices at the crossing, Hudson; (3) warnings given by the approaching train, Ortynski v. Grand Trunk Western R. Co., 307 Mich. 61, 11 N.W.2d 326 (1943); and (4) weather conditions, Kovacs v. Chesapeake v. Ohio Ry. Co., 134 Mich.App. 514, 528-29, 351 N.W.2d 581 (1984). And, even where there is evidence to support a jury determination of negligence, the defendant's negligence must still be shown to be the proximate cause of the plaintiff's injuries. If the collision would have occurred irrespective of such negligence, then it is not a substantial factor or cause in fact of the harm to the plaintiffs. Johnson v. Grand Trunk Western R Co., 58 Mich.App. 708, 713-16, 228 N.W.2d 795, 797-98 (1975).
 
 
 23
 Plaintiff produced sufficient evidence at trial to support a jury finding that the train was traveling at an unreasonable rate of speed. The train's timetable speed at the Oliver Street crossing was 60 m.p.h., but plaintiff's expert testified that 45 m.p.h. was a reasonable speed for that crossing. Three eyewitnesses testified the train was traveling between 40-60 m.p.h. The engineer admitted that he "could have been" traveling 59 m.p.h., and was cross-examined about a statement he had given to police shortly after the accident in which he stated that he was traveling 60 m.p.h. shortly before impact. Plaintiff produced an expert who testified that, if the train was traveling at 60 m.p.h. before application of the emergency brakes, the train must have been traveling 68-70 m.p.h. 1,200 feet west of the crossing if the engineer there initially braked in preparation for a routine reduction in timetable speed. Based upon this evidence, the jury could reasonably conclude that the engineer was operating the train at an unreasonable rate of speed.
 
 
 24
 The record lacks evidence, however, to support a conclusion that this negligence was the proximate cause of Hotchkiss's injuries. Plaintiff contended at trial that the excessive speed caused the accident because, had the train been traveling 8-10 m.p.h. slower 1,200 feet west of the crossing, it would have arrived at the intersection a second later than it actually did, allowing the snowplow to safely cross. Plaintiff's counsel repeatedly reminded the jury of the testimony of eyewitnesses who stated that the snowplow "almost made it." The following colloquy between plaintiff's counsel and her expert witness served as the evidence and basis for her theory of proximate cause:
 
 
 25
 Q: [By plaintiff's counsel] ..., can you tell the jury what conclusions you did reach that you are satisfied with.
 
 
 26
 A: [By Professor MacCrae] I guess there really are two possibilities. If the train speed never exceeded 60 miles an hour as the train approached Oliver Street, then there was no braking whatsoever at any time in the last quarter mile any way prior to the emergency application, which would have been just about the time of impact, a little before, a little after. I don't try to make that distinction.
 
 
 27
 The other possibility is that if the engineer braked as he said he braked, then the train speed was probably in the neighborhood of 68 to 70 miles an hour at the time he began the braking so described.
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 Q: Now, assuming that Engineer Leece had been operating at 60, that he had made a moderate application of about 15 PSI 1200 feet west of the crossing, do you have an opinion based upon a reasonable scientific certainty as to whether or not the collision against the Bobcat would have been avoided?
 
 
 31
 A: If you ask the question in the terms of the possibility just described or no braking at all, yes, I do have an opinion.
 
 
 32
 Q: What's your opinion?
 
 
 33
 A: My opinion is that had the braking taken place, that is a moderate application about the 1200 feet west of Oliver, then the train would have arrived at the crossing or at the point where impact occurred about a second later than it would have if no brake application at all had been made assuming the train speed was 60 either before the application or continuously into the crossing.
 
 
 34
 Q: Now--
 
 
 35
 A: In other words, the brake application delayed the arrival of the train by about one second.
 
 
 36
 Q: Then that's assuming that the train would have been traveling 60 as opposed to the 68 or 70 miles per hour.
 
 A: Yes
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 Q: Now, assuming that this train had been operating from Howard Street at a speed of 45 miles per hour heading eastbound towards Oliver, can you tell us how much longer it would have taken for the train to get to Oliver at 45 as compared to 60?
 
 A: Yes
 
 40
 Q: What is that calculation?
 
 
 41
 A: It would take about 13 seconds longer for the train to travel from Howard to Oliver at 45 than it would to travel from Howard to Oliver at 60.
 
 
 42
 Q: Professor MacRae, at my request, did you calculate what various emergency stopping distances would be for speeds of 60, 45 and 30?
 
 
 43
 * * *
 
 
 44
 * * *
 
 
 45
 A: These three stopping distances from the three speeds assume that an emergency brake application was applied with no other braking in effect. This is in effect a cold braking. The train is traveling at 60; and all of a sudden, the engineer decides he has to go to emergency, and he does that in one action. The distance required from 60 miles an hour to stop the train with that kind of emergency application is about 1300 feet. And I have made these approximate numbers so that they'll be general for maybe not just this train but most trains of a general character of this one. At 45 miles an hour, the distance would be about 750 to 800 feet; and at 30, about 350 to 400 feet.
 
 
 46
 On final argument, plaintiff's counsel repeated the evidence elicited:
 
 
 47
 Now, you will remember that we also asked Professor MacRae--because Mr. Benson, the defendants' expert came in and said well, Mr. Hotchkiss needed .7 seconds to clear the track. Well, what does speed have to do with this accident. First of all, speed has this to do with this accident. 45 miles an hour through that intersection, through that crossing, gives you a 13 second delay allowing Mr. Hotchkiss to clear safely. But even if Engineer Leece was going 60 miles an hour [1,200 feet west of the crossing], which we categorically submit to you is unreasonable, but even if he was, and if he had applied his brakes at 1200 feet, he would have been going approximately 50 miles an hour at impact. He would have saved at least a second. He would have been acting in a reasonable manner, and Michael Hotchkiss would be alive today.... And there is categorically complete agreement that he almost made it across that track.
 
 
 48
 Plaintiff's evidence that, had the train been traveling at 60 m.p.h at a point 1,200 feet west of the crossing, rather than 68-70 m.p.h., the snowplow would have had an "extra second" to cross, and her evidence that, had the train been traveling 45 m.p.h., it would have taken thirteen more seconds to travel the distance between Howard and Oliver Streets, is insufficient to establish proximate cause. Speed is not causal merely because the train arrived at the crossing the instant it did, while if it had been going slower, the snowplow might have safely crossed in front of it. Addressing such an argument, the Supreme Court of Wisconsin aptly stated the principle:
 
 
 49
 This court has never held that excessive or unlawful speed is causal merely because it places the vehicle at a particular place at a particular time. Excessive speed is causal, however, when it prevents or retards the operator, after seeing danger, from slowing down, stopping, or otherwise controlling the vehicle so as to avoid a collision.
 
 
 50
 Dombeck v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 24 Wisc.2d 420, 129 N.W.2d 185, 192 (1964) (quoting Baker v. Herman Mut. Ins. Co., 17 Wis.2d 597, 602, 117 N.W.2d 725, 728 (1962)). See also Johnson, 58 Mich.App. at 713-16 (train traveling at an excessive speed was not the proximate cause of an accident where the vehicle crossed when the train was only fifty feet away and the accident would not have been avoided had the train been traveling at a non-negligent speed). Evidence that the vehicle "almost made it across" or that "all but the rear two or three feet of the car had gotten across when struck by the locomotive" is insufficient to establish causation. Dombeck, 129 N.W.2d at 192.
 
 
 51
 As we concluded in Part II, the engineer had no duty, as a matter of law, to apply the brakes 1,200 feet west of the crossing when he first saw the snowplow on the north side of the tracks, headed away from the tracks. And there is no evidence in the record that a train traveling 45 m.p.h., applying its emergency brakes at the point at which it became evident that the snowplow was going to proceed onto the tracks, would have been able to avoid the collision.
 
 
 52
 None of the eyewitnesses were able to testify as to the position of the train west of the crossing at the point at which the snowplow spun around, or proceeded back across the tracks. Their attention was focused on the snowplow, although they were cognizant of the approaching train because of its horn. Inexplicably, neither counsel for plaintiff nor defendant asked the engineer what he thought his approximate position was at the time the snowplow turned around and began to head south, or the position of the train when it became evident that the snowplow intended to proceed into the crossing. The engineer's testimony was that all the events occurred within a "very few seconds."
 
 
 53
 Since the engineer was under no duty to slow the train until he reasonably should have known that the decedent was in the zone of danger, and we are unable to say, based on the evidence presented to the jury, at which point that may have occurred, the plaintiff's expert's computations are irrelevant. In any event, the jury cannot be permitted to speculate as to causation. Plaintiff's evidence that the train would have arrived at the crossing a second after it did had it been going 8-10 m.p.h. slower 1,200 feet west of the crossing, or that it would have taken thirteen more seconds to travel the distance between Howard Street and Oliver Street at a rate of 45 m.p.h., is insufficient to demonstrate that, if the train had been traveling 45 m.p.h., it would have been possible to slow the train in order to avoid the accident.
 
 IV.
 
 54
 For the reasons stated above, the judgment of the district court is reversed.
 
 
 55
 GEORGE CLIFTON EDWARDS, Jr., dissenting.
 
 
 56
 Conrail appeals the denial of its motion for judgment notwithstanding the verdict in this personal injury action.
 
 
 57
 I would affirm Judge Gibson's disposition which resulted after jury trial. The jury determined damages in the amount of $760,000 but also determined that plaintiff was 65% negligent. This resulted in the reduction of the gross verdict of $760,000 to the sum of $266,000. Even after this reduction, the defendants made a motion for judgment notwithstanding the verdict which the district court denied.
 
 
 58
 Viewing the proofs in this case in the light most favorable to the plaintiff and resolving all testimony in the plaintiff's favor, reasonable minds could differ as to the conclusions to be drawn from the evidence. See, e.g., Ratliff v. Wellington Exempted Village Schools Board of Education, 820 F.2d 792, 795 (6th Cir.1987); National Polymer Products v. Borg-Warner Corporation, 660 F.2d 171, 178 (6th Cir.1981). The plaintiff presented sufficient evidence to raise a question of fact for the jury concerning whether the Bobcat snowplow was in a position of danger before it headed back across the tracks in a southbound direction.
 
 
 59
 The cases cited by the majority involve collisions between a train and an automobile. As established at trial, a Bobcat snowplow differs significantly from an automobile. A piece of medium construction equipment such as a Bobcat snowplow makes so much noise that it is not uncommon for its driver to wear hearing protection. The plaintiff's decedent in fact wore such hearing protection at the time of his death. Operation of a medium piece of construction equipment usually involves more skill and concentration than does operation of an automobile. For example, the Bobcat snowplow required for its operation the use of both hands and both feet of its driver. A train engineer observing a piece of medium construction equipment such as a Bobcat snowplow working near the tracks after a heavy Michigan snow faces a very different situation than an engineer looking down the track to observe an automobile near the tracks.
 
 
 60
 The jury could have reasonably concluded, as it apparently did, that the engineer should have determined at 1200 feet that the Bobcat snowplow working near the tracks on the campus of Western Michigan University occupied a position of danger thereby requiring the engineer to check the speed of the train. The jury could have also reasonably determined, as it apparently did, that the engineer's excessive speed and lack of due care in assessing and reacting to the situation proximately caused the death of Mr. Hotchkiss. I decline the invitation to join in holding as a matter of law that the favorable results of prompt braking of the train, especially had it travelled at a reasonable speed through this busy university campus, were beyond the contemplation of reasonable jurors under the facts of the plaintiff's case. See generally Serratoni v. Chesapeake and Ohio Railway Company, 333 F.2d 621, 629 (6th Cir.1964). I dissent.
 
 
 
 [1]
 What role the last clear chance doctrine plays after Michigan's adoption of a pure comparative negligence system has not yet been resolved by the Michigan Supreme Court. See Callesen v. Grand Trunk Western R.R. Co., 175 Mich.App. 252, 437 N.W.2d 372 (1989) (abolished); Wilson v. Chesapeake & Ohio Ry. Co., 118 Mich.App. 123, 324 N.W.2d 552 (1982) (retained)